**AFFIDAVIT OF ZACHARY MERCER IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Zachary Mercer, being sworn, state:

## INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent (SA) with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF") where I have been employed since May of 2021.  I am currently assigned to the Springfield, Massachusetts Field Office.  As a Special Agent for ATF, some of my duties include the investigation and prevention of federal offenses involving the unlawful use, manufacture, and possession of firearms and explosives; acts of arson and bombings; and illegal trafficking of alcohol and tobacco products.  I attended and successfully completed the U.S. Department of Homeland Security Criminal Investigator Training Program and the ATF Special Agent Basic Training located in Glynco, Georgia.

2.      Through my training and employment, I have experience with and knowledge of conducting surveillance, using confidential informants, conducting undercover operations, executing arrest, search, and seizure warrants, and conducting court-authorized electronic surveillance.  I also have experience with and training in interviewing defendants, informants, and witnesses, and I have participated in the application for and execution of search warrants, including searches of residences.

3.      I am a "federal law enforcement officer" within the meaning of the Federal Rule of Criminal Procedure 41(a)(2)(C), that is, a government agent authorized to enforce criminal laws and duly authorized by the Attorney General to request a search warrant.

4.      I am currently investigating Ryan ANSART ("ANSART") and others known and unknown for violations of 18 U.S.C. § 922(o) (Illegal Possession of a Machine Gun) (the "SUBJECT OFFENSE").

5.      I respectfully submit this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(a):

      a.   The residence located at 18 Winona Drive, West Springfield,
           Massachusetts, including any outbuildings, sheds, and storage locations
           (the "SUBJECT LOCATION"), as further described in Attachment A.

6.      I have probable cause to believe that the SUBJECT LOCATION contains fruits, evidence, and instrumentalities of violations of the SUBJECT OFFENSE, as described in Attachment B.

7.      The facts in this affidavit come from my personal observations, my training and experience, review of records/documents, and information obtained from other agents, law enforcement officers, and/or confidential informant(s).  This affidavit is intended to show that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE

### *BACKGROUND*

8.      The ATF SFO, the Springfield Police Department ("SPD"), and the ATF Portland Field Office (Maine) ("ATF PFO") have been conducting an investigation into Ryan ANSART and others known and unknown.

9.      On April 10, 2022, JR's Trading and Pawn, a Federal Firearms Licensee ("FFL"),

located in Waterville, Maine, was burglarized. During the investigation, it was determined that two individuals broke into the FFL and stole approximately fifteen (15) firearms (six revolvers and nine semi-automatic pistols).

10.     On September 14, 2022, a state search warrant was sworn out by SPD for the SUBJECT LOCATION[1]. On the same day, members of the SPD, ATF SFO, and other state/local law enforcement agencies executed the search warrant at the SUBJECT LOCATION. The following firearms were seized from the SUBJECT LOCATION pursuant to the search warrant: one Glock 17, Gen 5, 9mm pistol bearing Serial #BTMW591, with a suspected full auto conversion device attached; one Polymer 80, 9mm pistol with a suspected full auto conversion device attached; one Smith and Wesson, .38 caliber, revolver bearing Serial #266377; and one Springfield Armory, Model 1911, .45 caliber pistol bearing Serial #NM530035. Additionally seized were assorted ammunition, assorted magazines, firearm parts and accessories, suspected marijuana and hallucinogens, US currency, personal papers, and a cell phone. Based on a query of the Massachusetts Criminal Justice Information System ("CJIS"), two of the firearms seized from the SUBJECT LOCATION were reported stolen from JR's Trading and Pawn, the FFL listed above, during the burglary that occurred on April 10, 2022. The two firearms were:  a Glock, Model 17 Gen 5, 9mm Pistol, bearing Serial Number BTMW591; and a Smith & Wesson, .38 caliber revolver, bearing Serial Number 266377.

11.     Subsequently, ANSART was arrested by the West Springfield Police Department

---

[1] The state search warrant was authorized by Springfield, Massachusetts District Court Clerk John J. Stocks (Search Warrant Docket# 22SW-172).

("WSPD") for the following offenses: Possession of a Machine Gun (2 counts), Possession of Firearms without a Firearms Identification Card (4 counts), Possession with Intent to Distribute Class C Controlled Substance, Possession with Intent to Distribute Class D Controlled Substance, Possession of Ammunition without a Firearms Identification Card, Possession of High Capacity Magazine (5 counts), and Receiving Stolen Property (2 counts).

12.     Following ANSART's arrest, the Hampden County District Attorney's Office provided a proffer agreement to ANSART's defense counsel, Terrence Dunphy. On October 6, 2022, ATF Special Agent ("SA") PJ McNeil (ATF PFO), SPD Police Officer Seth Barker, and myself conducted a video proffer with defense counsel Terrence Dunphy and ANSART. The following information was provided by ANSART during the proffer, in sum and substance.

13.     According to ANSART, he travelled to Waterville, Maine to purchase firearms from an individual known as Damien,[2] also referred to as "Monkey Man." ANSART stated, that on an unknown date, he travelled to MARCIAL-ALEXANDER's apartment in the "city center" of Waterville, Maine. Inside of the apartment ANSART observed "more than 10" handguns with price tags still affixed to them. According to ANSART, MARCIAL-ALEXANDER stated he obtained the firearms from a "pawn shop across the street." MARCIAL-ALEXANDER had been scoping the location out as a target for theft. According to ANSART, MARCIAL-ALEXANDER had stolen the handguns either that night or within a few days.

14.     ANSART informed investigators that while at MARCIAL-ALEXANDER's

---

[2] During the investigation, investigators believe that Damien, also known as "Monkey Man," is Damien MARCIAL-ALEXANDER.

apartment, he (ANSART) purchased a Glock, Model 17, pistol for one thousand two hundred dollars ($1,200.00) and a "cowboy gun," as described by ANSART, for eight hundred dollars ($800.00) from MARCIAL-ALEXANDER. Investigators believed that the two firearms ANSART described purchasing from MARCIAL-ALEXANDER were the two stolen firearms investigators seized from the SUBJECT LOCATION during the execution of the search warrant on September 14, 2022. As stated above, Investigators know that the two firearms seized from the SUBJECT LOCATION during the execution of the search warrant were indeed listed as stolen from the FFL in Waterville, Maine.

15.     ANSART also informed investigators that the following morning, MARCIAL-ALEXANDER and ANSART returned to ANSART's West Springfield, Massachusetts address with the remaining stolen firearms.

16.     To date, according to information received by ATF, approximately two of the fifteen firearms stolen from the FFL in Waterville, Maine (JR's Trading and Pawn) have been recovered. That leaves approximately thirteen firearms outstanding and not recovered.

### SPD OBTAINS SEARCH WARRANT FOR ANSART INSTAGRAM "k1ngbando"

17.     On or about August 11, 2022, SPD obtained a search warrant for an Instagram[3]

---

[3] According to Instagram, it is a "free photo and video sharing app available on iPhone and Android.  People can upload photos or videos to our service and share them with their followers or with a select group of friends.  They can also view, comment, and like posts shared by their friends on Instagram.  Anyone 13 and older can create an account by registering an email address and selecting a username" (URL: https://help.instagram.com/424737657584573).

account bearing the account name of "k1ngbando."[4] According to SPD, they had applied for the search warrant because they had previously observed what appeared to be firearms posted on the above listed Instagram account. Furthermore, according to SPD, on or about July 29, 2022, SPD obtained a telephone number for "k1ngbando." Utilizing this telephone number, SPD stated that they were able to identify the individual utilizing the Instagram account as ANSART. SPD stated that they knew the Instagram account profile to be controlled by ANSART based on their investigation and a comparison of ANSART's photograph on file with the Massachusetts Registry of Motor Vehicles ("RMV").

18.     I reviewed the response documents/data received from Meta Platforms, Inc (doing business as Instagram). The response documents/data revealed that the Instagram account "k1ngbando" was given the account number 6241066296 by Instagram and was being used/operated by ANSART. This belief was based on the Instagram messages, photographs, and videos, which were contained within the response documents/data received from Instagram and reviewed by me. For example, I reviewed a message sent on or about March 12, 2022, from ANSART to another Instagram account bearing Instagram account number 46261619104, account name "mass canna meds," which shows what appears to be ANSART's Commonwealth of Massachusetts Medicinal Marijuana Card. The card has what appears to be a photograph of ANSART and the name RYAN ANSART printed on the card.

---

[4] This search warrant was authorized by a Springfield (Massachusetts) District Court Clerk on or about August 11, 2022 (Search Warrant Docket# 22SW-163).

### POSTS ON INSTAGRAM ACCOUNT ASSOCIATED WITH ANSART

19.     Based on information received from SPD, on or about August 22, 2023, at approximately 7:25 pm, SPD observed an Instagram post, which was posted to the "Story"[5] on the Instagram account "lilrahfrmdamafia_" (hereinafter referred to as the "Instagram Account"). According to members of SPD, the Instagram Account is believed to be controlled/used by ANSART. This belief is based upon information obtained during the investigation, which will be detailed below, as well as the fact that I was able to determine that the account number assigned by Instagram to the Instagram Account was "6241066296." As set forth above, this Instagram account number was previously identified as being utilized by ANSART. At that time, ANSART was using the Instagram account name "k1ngbando."

20.     In the video post observed by members of SPD, which was posted on or about August 22, 2023, at approximately 6:53 pm, it showed a large plastic bag containing what appeared to be parts of multi-colored full auto conversion devices[6] also known as ("a/k/a") sear selector switches a/k/a switches. The operator of the camera then pans away from the bag and reveals a hand holding what appears to be a handgun with an apparent auto conversion device attached to the slide of the handgun (see below still images from the captured video):

---

[5] An Instagram "Story" is a video and/or picture posted by a user, which is viewable for 24 hours from the time that the "Story" is initially posted. The "Story" can be taken down/removed by a user prior to the expiration of the 24-hour time frame.

[6] A full auto conversion device, also known as fully automatic switches, are most commonly seen on Glock and Polymer (privately made firearms) brand/style handguns. Also referred to as a Glock conversion device or Glock auto sear, a switch is a part, or combination of parts, designed and intended for use in converting a semiautomatic pistol into a machinegun, therefore, it is a "machinegun."






21.     On or about August 29, 2023, at approximately 10:39 pm, SPD Police Officer Nate Jurkowski was viewing Instagram when he observed an Instagram post to the Instagram Account's Story. The post showed what appeared to be a light skinned male wearing a black balaclava style facemask, a black tee-shirt with a graphic of one-hundred-dollar bills wrapped in rubber bands and chains, red sweatpants, and grey sneakers with an undetermined amount of U.S. currency located at the individual's feet. On the left forearm of the individual one can observe a tattoo containing what appears to be the wing/wings of a bird/birds. SPD has been informed by West Springfield. Massachusetts Police Department ("WSPD") that their records document that ANSART has a tattoo of birds on his left forearm. In this post on the Instagram Account, the individual is holding an object in his right hand, which is covered with a superimposed blooddrop emoji. At the bottom of the blooddrop emoji and underneath the individual's fingers is what appears to be a dark-colored object. I know based on my training, experience, and information from other law enforcement members, that individuals will often utilize emojis/other graphics to fully or partially cover up objects like illegal narcotics and firearms. The individual in the post is standing in what appears to be the corner of a room, with what appears to be paneling on the walls and a laminate type flooring with a checkered pattern. As stated above, law enforcement members previously conducted a search warrant ANSART's residence, (the SUBJECT LOCATION), on September 14, 2022. During the course of the execution of the search warrant SPD Officers conducted a pre-search video of the dwelling prior to searching it. Based on a review of this video, I was able to observe paneling and flooring that looks identical to that of the paneling and flooring observed in the Story post on the Instagram Account (see below image taken from the SPD pre-search warrant video). Given this information, I believe that the individual depicted in the post is ANSART. Furthermore,

I believe the object that ANSART is holding in his right hand is a firearm. This determination is made based on the information set forth above as well as the manner in which the individual is holding the object (see image below captured by SPD from the post on the Instagram Account's Story). Lastly, I believe ANSART is located inside of the SUBJECT LOCATION at the time this photograph was taken:



Image captured by SPD from a post on the Instagram Account's Story



Close up image from the SPD captured image.



Still image captured from the SPD pre-search warrant video.

22.     On or about October 4, 2023, at approximately 1:19 pm, SPD Officer Jurkowski was viewing Instagram posts when he observed a post on the Instagram Account's Story. This particular post showed text superimposed over a dark-colored background, which spelled out:

11

"Who got a 33 rd mag" (see below image captured by SPD). According to Officer Jurkowski, approximately three minutes later on the same date, another post was made to the Instagram Account's Story with text superimposed over a black background, which spelled out, "Im paying good for whoever dan get me it" (see below image captured by SPD):

 

Based on my training, experience, information from other law enforcement personnel, as well as information gathered during the investigation, I believe that the post is referring to an attempt to obtain a firearm magazine, which can hold at least thirty-three individual rounds of ammunition.

23.     On the same date, October 4, 2023, at approximately 3:48 pm, SPD observed another post on the Instagram Account's Story, which was a screenshot from what appeared to be

Amazon[7]. The screenshot depicted a "SIXRAY 500 Lumen Pistol Light Laser Combo Rechargeable Blue Laser Beam" (see below image captured by SPD):



24.     On or about October 6, 2023, at approximately 8:20 pm, Officer Jurkowski observed a post to the Instagram Account's Story. This post was a video containing what appeared to be the exact same pistol light/laser combination device as depicted in the post to the Instagram's Account on October 4, 2023. The device was being held in the hand of a light skinned individual and was being manipulated by the individual.  A video of the post was captured by SPD.  A still

---

[7] Amazon, Inc. is an American multinational technology company focusing on e-commerce, cloud computing, online advertising, digital streaming, and artificial intelligence (Amazon (company) - Wikipedia).

image captured from the video is shown below:



    25.    On or about November 1, 2023, at approximately 4:10 pm, Officer Jurkowski was viewing Instagram posts when he observed a post on the Instagram Account's Story. In the post, which was posted at approximately 4:05 pm, a light skinned individual is holding what appears to be a handgun in his right hand. Also visible on the floor between the individual's feet is what appears to be another handgun. This second handgun has what appears to be an extended magazine protruding from the magazine well and an apparent yellow/gold auto conversion device attached to the slide of the handgun. An image captured from the video by SPD is set forth below. The individual appears to be inside of a dwelling with a dark brown hardwood floor. As stated above, law enforcement members executed a search warrant at the SUBJECT LOCATION on September

14

14, 2022. During the course of the execution of the search warrant SPD Officers made a pre-search

video of the dwelling prior to searching it. Based on a review of this video, I was able to observe

dark brown flooring that looks identical to that of the flooring observed in the Story post on the

Instagram Account (see below image taken from the SPD pre-search warrant video).



Image captured by SPD from the Instagram Account



Still image captured by me from the SPD pre-search warrant video.

26.     On November 7, 2023, ATF SA Christopher Bzduch and myself searched for the Instagram Account on Instagram. We were able to locate the account and navigated to the account profile page. We discovered that the Instagram Account was listed as private and were unable to see further content of the Instagram Account. We were able to determine that the Instagram Account number was "6241066296." As described above, this is the same Instagram account number that was previously identified as being used/controlled by ANSART. We surmised that ANSART changed the Instagram account name from "k1ngbando" to "lilrahfrmdamafia."

### INSTAGRAM ACCOUNT CONVERSES WITH SPD UC ACCOUNT

27.     On November 3, 2023, at approximately 1:19 pm, the Instagram Account

16

responded to a post that SPD Police Officer Nick Mancinone posted on his undercover Instagram

account. Officer Mancinone, while acting in an undercover capacity, then engaged the Instagram

Account in conversation. See the below conversation:





1                                                2



3



4

18



5



6

19



7



8



9



10

21



11



12



13



14



15



16

24



17



18

25



19



20

 

21                                      22

28.     As further detailed in the messages listed above, the Instagram Account sent a

message to Officer Mancinone which read, "I got a crazy case goin on in supioror." The Instagram

Account then sent Officer Mancinone several images (see above—screenshots 3 through 7), which

showed court documents including a list of charges and photographs that have stickers on them

with the words "Grand Jury Exhibit" printed on them. According to SPD, these were photographs

taken by SPD following the arrest of ANSART on September 14, 2022.

29.     As seen above in the conversation thread, Officer Mancinone and the Instagram

Account then discussed full auto conversion devices. The Instagram Account sent Officer

27

Mancinone a video (see above—screenshot images 12-14) showing a light skinned hand holding what appears to be a handgun with an apparent extended magazine inserted into the magazine well of the firearm and an apparent full auto conversion device, yellow/gold in color, attached to the slide. This video was removed from the message thread by the Instagram Account after it was viewed by Officer Mancinone, however, Officer Mancinone was able to capture the video prior to it being removed from the thread (see above still images taken from the video—images 12-14). Image number 15 shown above, depicts the location of the video in the message thread prior to it being removed by the Instagram Account.

30.      The Instagram Account informed Officer Mancinone that it currently had one (1) full auto conversion device (see above screenshot images 18-19). Officer Mancinone asked the Instagram Account what the price was for one of the full auto conversion devices and the Instagram Account replied with "200" (see image 10 above). The Instagram Account sent the following message to Officer Mancinone, "Im send u a vid of my man's blowing one in sec I'm at work atm" (see screenshot image 18 above). A short while later, the Instagram Account sent Officer Mancinone the following message, "Boutta show u how it works," along with a video. When reviewing the video, I was able to see a darker skinned hand holding an apparent handgun with an apparent full auto conversion device attached to the slide. The video then shows the handgun being fired in a fully automatic mode (see screenshot images 19-22 above). Officer Mancinone captured this video. The handgun in the video, which fired in fully automatic mode, appears to be the same firearm that the Instagram Account sent Officer Mancinone a video of earlier in the message thread (see screenshot images 12-14 above).

### *SURVEILLANCE OF SUBJECT LOCATION*

31.     On November 3, 2023, SPD Police Officer Seth Barker initiated surveillance at the

SUBJECT LOCATION after observing the post(s) on the Instagram Account. At approximately

1:50 pm, Officer Barker observed a work vehicle parked in front of the SUBJECT LOCATION.

Officer Barker then observed a male exit the vehicle wearing black pants and a black hooded

sweatshirt. The male had the hood of the sweatshirt pulled over his head only exposing part of his

face. Based on the physical characteristics of this individual, Officer Barker believed this male to

be ANSART. This was based on the fact that Officer Barker has interacted with ANSART in the

past including during the execution of the previous search warrant conducted at the SUBJECT

LOCATION by SPD. Officer Barker observed the male believed to be ANSART enter the

SUBJECT LOCATION.

### *ANSART INDICTED ON FEDERAL FIREARM CHARGES*

32.     On April 11, 2023, ANSART was indicted by a federal grand jury in the District of

Maine on the following charge: 18 USC 922(u), Theft of a Firearm from a Licensed Firearm

Dealer. ANSART was ultimately arraigned on this charge and is currently out on pre-trial release.

Based on information received from the U.S. Attorney's Office in Maine and ATF Portland Maine

Field Office, ANSART was released with the understanding that he was going to reside at the

SUBJECT LOCATION.

33.     Based on all of the information described above, I believe that the Instagram

Account is being utilized/controlled by ANSART. Furthermore, based on the posts made to the

Instagram Account, I believe that ANSART is in possession of at least one firearm, ammunition,

and an auto conversion device. I further believe that ANSART is utilizing the SUBJECT

LOCATION as his residence. This belief is based upon the Instagram posts as well as the fact that ANSART provided this address to the federal court in Maine as his residence. Additionally, I believe that ANSART is storing at least one firearm, ammunition, and an auto conversion device at the SUBJECT LOCATION. This information is based upon my training, experience, information received from other law enforcement members, and the information collected during the case to include the Instagram posts.

## THE INSTAGRAM ACCOUNT

34.     On November 21, 2023, SA Bzduch was informed by SPD Officer Barker that the Instagram Account ("lilrahfrmdamafia") believed to be controlled/used by ANSART was believed to be deactivated.

35.     On November 22, 2023, SA Bzduch attempted to locate the Instagram Account on the Instagram application, however, SA Bzduch was unable to locate the account. I believe that ANSART may have deactivated the account.

## NATIONAL FIREARMS ACT & MACHINE GUNS

36.     The Gun Control Act, 18 U.S.C. § 922(o), prohibits the transfer or possession of a machinegun manufactured after May 19, 1986. ATF is not aware of any Glock/Polymer conversion devices that were developed before May 19, 1986. As such, Glock/Polymer conversion devices are considered post-1986 machineguns. Therefore, they may only be lawfully possessed by properly licensed Federal Firearms Licensees who have paid the appropriate Special Occupational Tax required of those manufacturing, importing, or dealing in National Firearms Act (NFA) firearms under the authority of the United States and any department or agency thereof or a State or a department, agency, or political subdivision thereof (18 U.S.C. § 922(o)). I know that

conversion is fast, simple, and requires little technical expertise, in that most conversions typically involve removal of the original polymer slide cover plate and replacement with the conversion device. In some cases, the device may actually be attached to the existing slide cover plate. Furthermore, I also know that the conversion device is usually made of metal, and the conversion process can take less than 60 seconds to complete.  There are "How-To" videos of this conversion which are accessible and easily located online.

37.     Based on my training and experience, I know that individuals who own or possess firearms generally keep them on their person, in their residence, on their property, or in their vehicles to afford ease of access and to provide security. Further, individuals who manufacture firearms without a license, often use their residence as a workspace or to store parts and tools associated with their activities. Firearms are relatively expensive and do not easily wear out and therefore individuals maintain them over a long period of time. Further, I know that most people store their firearms related materials (ammunition, cleaning kits, manuals, etc.) in their homes, on their property or in their vehicles. These components are likely to be located in proximity to or in the firearms with which they are intended to be used.

38.     Based on my training and experience, I know that people research how to manufacture/modify firearms, and manufacture "80% receivers" into actual "firearms" by searching the internet and/or reading firearms books/manuals. I also know that people who order parts/components can do so via the internet and store these materials on their computers/mobile cellular devices at their homes. As set forth above, based on a post made on the Instagram Account, ANSART has made at least one purchase of a firearm part/component/accessory from an online company.

31

39.     Based on my training and experience I know that individuals who manufacture/modify firearms use machines and/or tools to do so. The tools can include a variety of machines, which could include, milling machines, drill presses, or other hand tools. I know that individuals who manufacture firearms from "80%" receivers, use the aforementioned tools and machines to finish/complete the manufacturing process and make a "firearm" receiver (frame). This receiver is then assembled with other firearms parts components in order to make a functioning firearm.  These other firearms parts and components can be purchased locally or through the Internet and are generally stored in the individual's residence, or in close proximity to or affixed to the firearm receiver.

40.     Based on my training and experience I know that individuals who purchase firearms and firearms components, both from stores and online entities, receive physical and electronic records and receipts relating to their purchases. These records are usually included with purchased firearms and firearms components during shipment, and these individuals typically keep these records at their residences.

41.     I also know, based upon my training and experience, that with the proper knowledge, computer software, and machining equipment, individuals have the ability to manufacture both semi-automatic firearms and fully automatic machineguns from scratch.  These firearms can be manufactured with the use of lathes or computer numerical control ("CNC") machines, which are digitally automated machining centers capable of cutting and fabricating solid materials including firearms parts. With this type of equipment, a subject can manufacture firearms that perform as well as those created by FFL manufacturers and can place on the firearms any type of markings, symbols, or serial numbers the subject desires.

42.    Based upon my experience in conducting criminal investigations of violations of federal firearm and ammunition laws, I know that illegal firearm manufacturing organizations have developed a number of methods to insulate their illegal activities from law enforcement detection. These methods are common to major firearm and ammunition manufacturing organizations to varying degrees of sophistication.

43.    I know that illegal firearm manufacturers/possessors often use techniques to prevent the detection of firearms that are shipped unlawfully through mail and common carriers by means of falsifying invoices, bills of sale, shipping papers, and customs forms by listing the firearms as other items, including but not limited to firearms parts and pieces (rather than complete firearms) and components used in the automotive, industrial, and machinery industries. In addition, illegal firearm manufacturers/possessors often conceal firearms inside of other objects to avoid detection by law enforcement officials.

44.    I know that another common technique of illegal firearm manufacturers/possessors is the use of latex, vinyl, and/or other gloves by individuals handling firearms and ammunition while processing packages for shipment.  This is done in order to prevent fingerprints from being left on items that could later be used as evidence against such individuals.

45.    I know, based upon experience, that one key indicator of illegal firearm manufacturers/possessors is the use of complex methods for ordering, paying for, and transferring the firearms, firearm components, and/or ammunition.  I know that illegal firearm and ammunition traffickers use payment methods that are often difficult to trace, which include utilizing U.S. currency, money orders, wire-transfers, PayPal accounts, and/or pre-paid credit

cards held by different subjects. Illegal firearm and ammunition traffickers use these methods as means of compartmentalization in order to minimize the ability for law enforcement officials to identify the original source of funds.

46.      I know that illegal firearm manufacturers/possessors often use cellular telephones that are held in the names of other living or fictitious persons and/or change numbers frequently in order to limit law enforcement officials' ability to identify and track suspects' call histories. In addition, I know that illegal firearm manufacturers/possessors often use computers and electronic storage devices to acquire, pay for, sell, transfer, and keep records of firearm purchases and sales. Firearm manufacturers/possessors also use code words for quantities and types of firearms and ammunition that are being purchased, sold, and/or transferred in effort to avoid detection by law enforcement officials.

47.      Based on my training and experience, and participation in illegal firearms manufacturing /possession investigations, I know:

a.   That illegal firearm manufacturers/possessors normally keep firearms in their homes, on their person, on their property, or in their vehicles. Firearms manufacturers/possessors consider these items as highly sought-after commodities and as such assign significant value to them.  They keep these commodities in the homes, on their person, on their property, or in their vehicles in an effort to provide security for their firearms and to keep their activities clandestine as sometimes their possession, brandishing, and use of these items is illegal, and they are constantly aware of law enforcement's efforts to discover their activity.

b.  That illegal firearm manufacturers/possessors commonly maintain names and contact information in books, ledgers, telephones, computers, electronic tablets such as iPads, other digital devices, and digital storage media, which reflect the names, addresses, telephone numbers, and email addresses of their firearms sales' customers.

c.  That illegal firearm manufacturers/possessors frequently take or cause to be taken photographs of themselves, their associates, their property, and their firearms and illicit proceeds.  These illegal firearm manufacturers/possessors usually maintain these photographs in their residences, electronic devices used by them, or in properties owned or rented by them.

d.  That illegal firearm manufacturers/possessors who have amassed proceeds from their firearms manufacturers/possessors will often attempt to legitimize these profits.  In this process illegal firearm manufacturers/possessors often use, among other things, banks and their attendant services, securities, cashier's checks, money drafts, wire transfers, real estate, shell corporations, business funds, and vehicles. Records evidencing such services, items, and transactions are maintained where the illegal firearm manufacturers/possessors have ready access to them, including their residences, electronic devices used by them, or in properties owned or rented by them.  These items can remain at the illegal firearm manufacturers/possessor's property for a long period of time.

35

***Seizure of Computer Equipment and Data***

48.     From my training, experience, and information provided to me by other agents, I am aware that individuals frequently use computers to create and store records of their actions by communicating about them through email, instant messages, and updates to online social networking websites; drafting letters; keeping their calendars; arranging for travel; storing pictures; researching topics of interest; buying and selling items online; and accessing their bank, financial, investment, utility, and other accounts online.

49.     From my training, experience, and information provided to me by other agents, I am aware that individuals commonly store records of the type described in Attachment B in computer hardware, computer software, computer-related documentation, and storage media.

50.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or even years after they have been written, downloaded, saved, deleted, or viewed locally or over the internet.  This is true because:

      a.  Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost. Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

      b.  Even after files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear;

rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c. Wholly apart from user generated files, computer storage media – in particular, computers' internal hard drives – contain electronic evidence of how the computer has been used, what it has been used for, and who has used it. This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files. It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d. Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

51.     Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or

programmed destruction, it is often necessary that computer hardware, computer software, computer-related documentation, and storage media ("computer equipment") be seized and subsequently processed by a qualified computer specialist in a laboratory setting rather than in the location where it is seized. This is true because of:

    a.  The volume of evidence storage media such as hard disks, flash drives, CD-ROMs, and DVD-ROMs can store the equivalent of thousands or, in some instances, millions of pages of information. Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names. Searching authorities may need to examine all the stored data to determine which particular files are evidence, fruits, or instrumentalities of criminal activity. This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis on site.

52.    Technical requirements – analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment. The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications. Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data. Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, password protected, or encrypted files. Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches.

Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

53.     Consequently, law enforcement agents may either copy the data at the SUBJECT LOCATION to be searched or seize the computer equipment for subsequent processing elsewhere.

54.     The SUBJECT LOCATION may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene. Computer equipment and data can be disguised, mislabeled, or used without the owner's knowledge. In addition, technical, time, safety, or other constraints can prevent definitive determination of their ownership at the SUBJECT LOCATION during the execution of this warrant. If the things described in Attachment B, are of the type that might be found on any of the computer equipment, this application seeks permission to search and seize it onsite or off-site in order to determine their true use or contents, regardless of how their contents or ownership appear or are described by others at the scene of the search.

55.     Therefore, there is probable cause to believe that the SUBJECT LOCATION will contain: (a) firearms manufacturing proceeds being stored, deposited, concealed, used in monetary and financial transactions and laundered; (b) the firearms and related items purchased online by ANSART and ultimately delivered to the SUBJECT LOCATION, and related documentation and/or software; and (c) other evidentiary items associated with ordering and purchase of items from online websites, such as digital receipts, shipping confirmations, delivery confirmations, etc.

56.     Based on my training, experience, and information provided by other law enforcement officers, I know that many cell phones (which are included in Attachment B's definition of "hardware") can now function essentially as small computers.  Phones have capabilities that include serving as a wireless telephone to make audio calls, digital camera, portable media player, GPS navigation device, sending and receiving text messages and emails, and storing a range and amount of electronic data.  Examining data stored on devices of this type can uncover, among other things, evidence of communications and evidence of communications and evidence that reveals or suggests who possessed or used the device.

57.     I am aware of a report from the United States Census Bureau that shows that in 2016, among all households nationally, 89 percent had a computer, which includes smartphones, and 81 percent had a broadband Internet subscription.  Specifically, in 2016, when the use of smartphone ownership was measured separately for the first time, 76 percent of households had a smartphone and 58 percent of households had a tablet, and 77 percent of households had a desktop or laptop computer.  Further, according to the Pew Research Center, as of 2019, 96 percent of adult Americans own a cellphone, and 81 percent own a cellphone with significant computing capability (a "smartphone").  The percentage of adults that own a smartphone is even higher among younger demographic groups:  96 percent of 18-29, year-olds, 92 percent of 30-49, year-olds, and 79 percent of 50–64-year-olds owned smartphones in 2019.  From my training and experience, I also know that individuals like ANSART is likely to carry a smartphone with him when they are outside their residence or vehicle.

58.     From my training and experience, I am aware that personal computer systems are generally capable of creating, receiving, and otherwise processing computer files generated at or

to be used at a business, even an informal business such as personally manufactured firearms, including e-mail, word-processing documents, photographs, and spreadsheets.  From my training, experience, and information provided to me by other agents, I am aware that businesses and individuals commonly store records of the type described in Attachment B in computer hardware, computer software, smartphones, and storage media.

59.     As set forth above, it is believed that ANSART has conducted at least one purchase of a firearm part/component/accessory (laser/light attachment for a handgun), from an online company.

60.     Based on my knowledge, training, experience, and information provided to me by other agents, I know that computer files or remnants of such files can be recovered months or years after they have been written, downloaded, saved, deleted, or viewed locally or over the Internet.  This is true because:

> a.  Electronic files that have been downloaded to a storage medium can be stored for years at little or no cost.  Furthermore, when users replace their computers, they can easily transfer the data from their old computer to their new computer.

> b.  Even after files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data, which might not occur for long periods of time.

In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user generated files, computer storage media ─ in particular, computers' internal hard drives ─ contain electronic evidence of how the computer has been used, what it has been used for, and who has used it.  This evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  It is technically possible to delete this information, but computer users typically do not erase or delete this evidence because special software is typically required for that task.

d.  Similarly, files that have been viewed over the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache." The browser often maintains a fixed amount of hard drive space devoted to these files, and the files are overwritten only as they are replaced with more recently viewed Internet pages or if a user takes steps to delete them.

e.  Data on a storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, email programs, and chat programs

store configuration information on the storage medium that can reveal
information such as online nicknames and passwords.  Operating systems
can record additional information, such as the attachment of peripherals,
the attachment of USB flash storage devices or other external storage
media, and the times the computer was in use. Computer file systems can
record information about the dates files were created and the sequence in
which they were created, although this information can later be falsified.

f.  As explained herein, information stored within a computer and other
electronic storage media may provide crucial evidence of the "who, what,
why, when, where, and how" of the criminal conduct under investigation,
thus enabling the United States to establish and prove each element or
alternatively, to exclude the innocent from further suspicion.  In my
training and experience, information stored within a computer or storage
media (*e.g.*, registry information, communications, images and movies,
transactional information, records of session times and durations, internet
history, and anti-virus, spyware, and malware detection programs) can
indicate who has used or controlled the computer or storage media.  This
"user attribution" evidence is analogous to the search for "indicia of
occupancy" while executing a search warrant at a residence.  The
existence or absence of anti-virus, spyware, and malware detection
programs may indicate whether the computer was remotely accessed, thus
inculpating or exculpating the computer owner.  Further, computer and

43

storage media activity can indicate how and when the computer or storage

media was accessed or used.  For example, as described herein, computers

typically contain information that log: computer user account session

times and durations, computer activity associated with user accounts,

electronic storage media that connected with the computer, and the IP

addresses through which the computer accessed networks and the internet.

Such information allows investigators to understand the chronological

context of computer or electronic storage media access, use, and events

relating to the crime under investigation.  Additionally, some information

stored within a computer or electronic storage media may provide crucial

evidence relating to the physical location of other evidence and the

suspect.  For example, images stored on a computer may both show a

particular location and have geolocation information incorporated into its

file data.  Such file data typically also contains information indicating

when the file or image was created.  The existence of such image files,

along with external device connection logs, may also indicate the presence

of additional electronic storage media (*e.g.*, a digital camera or cellular

phone with an incorporated camera).  The geographic and timeline

information described herein may either inculpate or exculpate the

computer user.  Last, information stored within a computer may provide

relevant insight into the computer user's state of mind as it relates to the

offense under investigation.  For example, information within the

44

computer may indicate the owner's motive and intent to commit a crime (*e.g.*, internet searches indicating criminal planning), or consciousness of guilt (*e.g.*, running a "wiping" program to destroy evidence on the computer or password protecting/encrypting such evidence in an effort to conceal it from law enforcement).

g.  A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

h.  The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  While it is possible to specify in advance the records to be sought, computer evidence is not always data that can be merely reviewed by a review team and passed along to investigators.  Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

i.  Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.  For example, the

45

presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

j.  In addition, based on my knowledge, training, and experience, I know that businesses and businesspeople often retain correspondence, financial, transactional, and other business records for years to identify past customers and vendors for potential future transactions; keep track of business deals; monitor payments, debts, and expenses; resolve business disputes stemming from past transactions; prepare tax returns and other tax documents; and engage in other business-related purposes.

61.     Based on my knowledge and training and the experience of other agents with whom I have spoken, I am aware that in order to completely and accurately retrieve data maintained in computer hardware, computer software or storage media, to ensure the accuracy and completeness of such data, and to prevent the loss of the data either from accidental or programmed destruction, it is often necessary that computer hardware, computer software, and storage media ("computer equipment") be seized and subsequently processed by a computer specialist in a laboratory setting rather than in the location where it is seized.  This is true because of:

a.  The volume of evidence ─ storage media such as hard disks, flash drives, CDs, and DVDs can store the equivalent of thousands or, in some instances, millions of pages of information.  Additionally, a user may seek to conceal evidence by storing it in random order or with deceptive file names.  Searching authorities may need to examine all the stored data to

46

determine which particular files are evidence, fruits, or instrumentalities of criminal activity.  This process can take weeks or months, depending on the volume of data stored, and it would be impractical to attempt this analysis onsite.

b.  Technical requirements ─ analyzing computer hardware, computer software or storage media for criminal evidence is a highly technical process requiring expertise and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications.  Thus, it is difficult to know, before the search, which expert possesses sufficient specialized skill to best analyze the system and its data.  Furthermore, data analysis protocols are exacting procedures, designed to protect the integrity of the evidence and to recover even "hidden," deleted, compressed, or encrypted files.  Many commercial computer software programs also save data in unique formats that are not conducive to standard data searches.  Additionally, computer evidence is extremely vulnerable to tampering or destruction, both from external sources and destructive code imbedded in the system as a "booby trap."

62.    Consequently, law enforcement agents may either copy the data at the premises to be searched or seize the computer equipment for subsequent processing elsewhere.

63.    The premises may contain computer equipment whose use in the crime(s) or storage of the things described in this warrant is impractical to determine at the scene.  Computer

equipment and data can be disguised, mislabeled, or used without the owner's knowledge.  In

addition, technical, time, safety, or other constraints can prevent definitive determination of their

ownership at the premises during the execution of this warrant.  If the things described in

Attachment B, are of the type that might be found on any of the computer equipment, this

application seeks permission to search and seize it onsite or off-site in order to determine their

true use or contents, regardless of how the contents or ownership appear or are described by

people at the scene of the search.

64.    The law enforcement agents will endeavor to search and seize only the computer

equipment which, upon reasonable inspection and/or investigation conducted during the

execution of the search, reasonably appear to contain the evidence in Attachment B.  If, however,

the law enforcement agents cannot make a determination as to use or ownership regarding any

particular device, the law enforcement agents will seize and search that device pursuant to the

probable cause established herein.

65.    This warrant seeks authorization for a review of electronic storage media seized,

electronically stored information, communications, other records, and information seized,

copied, or disclosed pursuant to this warrant in order to locate evidence, fruits, and

instrumentalities described in this warrant.  The review of this electronic data may be conducted

by any Government personnel assisting in the investigation, who may include, in addition to law

enforcement officers and agents, attorneys for the Government, attorney support staff, and

technical experts.  Pursuant to this warrant, the agents may deliver a complete copy of the seized,

copied, or disclosed electronic data to the custody and control of attorneys for the Government

and their support staff for their independent review.

### *Unlocking A Device Using Biometric Features*

66.     I know from my training and experience, as well as from information found in publicly available materials, that some models of cellphones made by Apple and other manufacturers, offer their users the ability to unlock a device via the use of a fingerprint or through facial recognition, in lieu of a numeric or alphanumeric passcode or password.

67.     On the Apple devices that have this feature, the fingerprint unlocking feature is called Touch ID.  If a user enables Touch ID on a given Apple device, he or she can register up to 5 fingerprints that can be used to unlock that device.  The user can then use any of the registered fingerprints to unlock the device by pressing the relevant finger(s) to the device's Touch ID sensor.  In some circumstances, a fingerprint cannot be used to unlock a device that has Touch ID enabled, and a passcode must be used instead, such as: (1) when more than 48 hours has passed since the last time the device was unlocked and (2) when the device has not been unlocked via Touch ID in 8 hours <u>and</u> the passcode or password has not been entered in the last 6 days.  Thus, in the event law enforcement encounters a locked Apple device, the opportunity to unlock the device via Touch ID exists only for a short time.  Touch ID also will not work to unlock the device if (1) the device has been turned off or restarted; (2) the device has received a remote lock command; or (3) five unsuccessful attempts to unlock the device via Touch ID are made.

68.     The passcode that would unlock any device(s) found during the search of the SUBJECT LOCATION is not currently known to law enforcement.  Thus, it may be useful to press the finger(s) of the user(s) of any device found during the search of the SUBJECT

LOCATION to the device's fingerprint sensor or to hold the device up to the face of the owner in an attempt to unlock the device for the purpose of executing the search authorized by this warrant.  The Government may not otherwise be able to access the data contained on those devices for the purpose of executing the search authorized by this warrant.

69.     In my training and experience, the person who is in possession of a device or has the device among his or her belongings at the time the device is found is likely a user of the device.  However, in my training and experience, that person may not be the only user of the device whose fingerprints are among those that will unlock the device and it is also possible that the person in whose possession the device is found is not actually a user of that device at all.  Furthermore, in my training and experience, I know that in some cases it may not be possible to know with certainty who is the user of a given device, such as if the device is found in a common area of a premises without any identifying information on the exterior of the device.  Thus, it may be necessary for law enforcement to have the ability to require any occupant of the SUBJECT LOCATION to press their finger(s) against the sensor of the locked device(s) or place the devices in front of their faces in order to attempt to identify the device's user(s) and unlock the device(s).

70.     For these reasons, I request that the Court authorize law enforcement to press the fingers (including thumbs) of ANSART and any individuals found at the SUBJECT LOCATION to the sensor of the devices or place the devices in front of their faces for the purpose of attempting to unlock the device in order to search the contents as authorized by this warrant.

**CONCLUSION**

71.     Based on the information described above, I believe that ANSART has committed, is committing, and will continue to commit the SUBJECT OFFENSE.

72.     Based on above information uncovered in my investigation and my training and experience, I believe there is probable cause to believe that the SUBJECT LOCATION contains the evidence and instrumentalities of violations of the SUBJECT OFFENSE listed above, as described in Attachment B, including a firearm, ammunition, full auto conversion device or machine gun, firearm parts/components/accessories such as frames, slides, barrels, and magazines; tools and/or jigs used to manufacture/modify firearms, and various records, including financial records, shipping records, shipping labels, tracking numbers, photographs, and contact information of ANSART's associates and potential firearm customers.

73.     Therefore, I believe that ANSART has committed violations of the SUBJECT OFFENSE and that the SUBJECT LOCATION contains fruits, evidence, and instrumentalities

of these crimes.

Respectfully submitted,

/s/ Zachary Mercer

Signed electronically with authorization from
ATF Special Agent Zachary Mercer on November 28, 2023.

Zachary Mercer, Special Agent
U.S. Bureau of Alcohol, Tobacco, Firearms
and Explosives

Subscribed and sworn to before me on this 28th day of November, 2023.

/s/ Katherine A. Robertson

KATHERINE A. ROBERTSON
United States Magistrate Judge

Signed electronically with authorization from
Katherine A. Robertson, U.S. Magistrate Judge on November 28, 2023.



Certified to be a true and
correct copy of the original
Robert M. Farrell, Clerk
U.S. District Court
District of Massachusetts

By: _____
       Deputy Clerk

Date: 11/28/2023